UNITED STATES, Appellee,

v.

Eric B. PACHECO, Specialist,
U.S. Army, Appellant.

No. 00–0346.
Crim.App. No. 9500002.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 28, 2001.

Decided Sept. 28, 2001.

CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE, EFFRON, and BAKER, JJ., joined. BAKER, J., filed a concurring opinion. SULLIVAN, J., filed a dissenting opinion.

For Appellant: *Captain Paul R. Almanza* (argued); *Colonel David L. Hayden, Lieutenant Colonel Edith M. Rob,* and *Major Anthony P. Nicastro* (on brief).

For Appellee: *Captain Arun J. Thomas* (argued); *Colonel Adele H. Odegard, Lieutenant Colonel David A. Mayfield,* and *Major Mary M. McCord* (on brief).

Chief Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, appellant was convicted by officer and enlisted members in Port–au–Prince, Haiti, of dereliction of duty and larceny, in violation of Articles 92 and 121, Uniform Code of Military Justice, 10 USC §§ 892 and 921, respectively. The convening authority approved the sentence of a bad-conduct discharge, 6 months' confinement, total forfeitures, and reduction to the lowest enlisted grade. The Court of Crimi-

nal Appeals affirmed the findings and sentence in a short form, unpublished opinion. We granted review of the following issue:

WHETHER THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE FINDINGS THAT APPELLANT WAS GUILTY OF LARCENY AND DERELICTION OF DUTY WHERE APPELLANT WAS COMPLYING WITH A LAWFUL ORDER.*

We hold that the evidence is not only legally sufficient to prove appellant was derelict in not securing a weapons cache found during Operation Restore Democracy, Port au Prince, Haiti, but also that it is legally sufficient to prove he stole a Desert Eagle pistol from the same cache.

Under *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard used to determine whether evidence is legally sufficient requires all relevant evidence to be viewed "in the light most favorable to the prosecution," including "reasonable inferences" to be drawn from that evidence. Applying that standard here, the evidence supports the finding that appellant was not acting pursuant to an order given by Sergeant (SGT) Marjamaki, but rather, that he was acting with SGT Marjamaki to steal a Desert Eagle .357 Magnum and give it to Private (PVT) Mangold.

Appellant was a member of a unit assigned to guard a weapons cache found during Operation Restore Democracy. First Lieutenant (1LT) Melano, the company executive officer and acting commanding officer, took an M–79 grenade launcher and a MAC system machine gun from the weapons cache to be kept as unit trophies. 1LT Melano testified that at that time, he was "under the impression from my battalion commander that we could legitimately take some weapons back with us." With 1LT Melano's permission, SGT Marjamaki gave a bayonet from the weapons cache to each member of his squad. SGT Marjamaki testified that between the 9th and the 11th of October, he and appellant took three weapons from the bunker.

The day before President Aristide returned to Haiti, PVT Mangold came to the bunker complex. SGT Marjamaki testified that PVT Mangold wanted a Desert Eagle, and that appellant went and got him one after SGT Marjamaki gave appellant the keys. Although the evidence shows that SGT Marjamaki told appellant to obtain the Desert Eagle for PVT Mangold, we need not consider whether such a directive constituted an apparently lawful order. The testimony of Private First Class (PFC) Holland—which was not challenged by the defense—that SGT Marjamaki disavowed in appellant's presence any knowledge of or responsibility for appellant's taking of the weapon effectively nullifies appellant's argument that he acted pursuant to an apparently lawful order in taking the Desert Eagle.

The day President Aristide returned, Sergeant First Class Jones told appellant and the others in the squad that they could not have any weapons, including any old bayonets. That same evening, SGT Marjamaki testified appellant told him he could take a weapon apart and sew it into his rucksack. In addition, when appellant's unit returned to the main base, they were told there was going to be a shakedown because of some missing weapons. SGT Marjamaki testified that after this warning, appellant said he would not surrender his weapons, and the authorities would never find them. After the shakedown, two weapons were found next to a trash dump and one was found next to a wall.

On cross-examination, SGT Marjamaki said that appellant not only wanted the Desert Eagle, but the case cleaning kit and everything that went with it. He was going to take them and ship them back to the States.

The findings of guilty are also supported by PVT Mangold's testimony that he went to the bunker with SGT Marjamaki and received a Desert Eagle pistol from appellant. According to PVT Mangold, the weapon was not for a museum; nor was it a war trophy.

---

* Based on the Government concession, the case should be returned to the Judge Advocate General of the Army to determine whether appellant is entitled to relief under *United States v. Gorski,* 47 MJ 370 (1997).

It was for his own personal use. In addition to the pistol, PVT Mangold was given a cleaning kit, brush, warranty, and a key to disassemble the weapon. PVT Mangold testified that he took the weapon out of the box, threw the box away, gave the weapon to PVT Sweeny, who was going on emergency leave to the United States, and told PVT Sweeny he would pay him later for his trouble in smuggling the weapon into the United States.

PFC Holland also testified that he remembered the night when appellant gave the weapon to PVT Mangold. In fact, he saw SGT Marjamaki give appellant the key to go to the bunker and get a weapon for PVT Mangold. He also heard SGT Marjamaki say that "if he [appellant] gets caught, tell them I don't know nothing about it." Later, PFC Holland had a conversation with appellant about smuggling the weapon into the United States.

To sustain a conviction for larceny under the UCMJ, the following elements must be proven:

(a) That the accused wrongfully took, obtained, or withheld certain property from the possession of the owner or of any other person;

(b) That the property belonged to a certain person;

(c) That the property was of a certain value, or of some value; and

(d) That the taking, obtaining, or withholding by the accused was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any person other than the owner.

Para. 46b(1), Part IV, Manual for Courts–Martial, United States (2000 ed.).

■ The wrongfulness of appellant's taking of the weapon, as well as his intent to permanently deprive the owner of the use and benefit of the weapon, is further evidenced by the fact that he did not return the Desert Eagle pistol or inform the authorities of its taking after being informed that the taking of weapons was not permitted and

that all weapons had to be returned prior to the shakedown.

■ To sustain a conviction of willful dereliction of duty under the UCMJ, the following elements must be proven:

(a) That the accused had certain duties;

(b) That the accused knew or reasonably should have known of the duties; and

(c) That the accused was willfully derelict in the performance of those duties. Para. 16b(3), Part IV, Manual, *supra.*

Appellant's knowledge of his duty to safeguard the weapon from unlawful appropriation or retention—including appropriation or retention by unit members seeking to obtain and keep weapons as trophies—and his willful dereliction of this duty are established by the evidence that after he was informed that the taking of weapons as trophies was not permitted, appellant failed either to return the weapon or to inform the authorities of its taking.

The evidence presented at trial circumstantially shows that those who possessed the weapons did not think they were entitled to take them, keep them, and show them to their friends and relatives as war trophies. Thus, the court below was correct in concluding that the evidence was legally sufficient as to the findings of guilty of larceny and dereliction of duty.

The decision of the United States Army Court of Criminal Appeals is affirmed.

BAKER, Judge (concurring):

For the reasons set forth, I find the evidence legally sufficient for both offenses and, thus, join the majority in affirming the court below. I write separately because I find some, but not all of the majority opinion's facts persuasive in applying *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In particular, I would rely on those facts recounted below for which there is a direct nexus between appellant and the Mangold Desert Eagle; I do not rely on facts associated with other Desert Eagles, such as appellant's alterations to his pack, for which appellant was not convicted. Second, I would not apply a theory of wrongful with-

holding, based on a failure to return the pistol or report its taking, in order to sustain appellant's conviction for dereliction of duty. Applying *Jackson*, I conclude the panel could find that appellant intended to permanently deprive the government of Haiti of the pistol at the time he took it for PVT Mangold. The panel's conclusion regarding dereliction of duty logically follows.

## I. FACTS

Appellant was part of the force guaranteeing the removal of the dictatorial regime in Haiti during Operation Restore Democracy. On September 10, 1994, prior to the landing of forces, the operational commander issued General Order # 1. That order prohibited, *inter alia*, the "taking or retention of war trophies or individual souvenirs." *

On October 2, 1994, during a routine patrol, the squad to which appellant was attached found a cache of individual and crew-served weapons in bunkers at Fort Dimache, Haiti. Among the weapons were conventional American military weapons, a number of submachine guns, and several "Desert Eagle" pistols in various calibers. Another unit assumed responsibility for security of the bunkers, and the squad was assigned other duties. However, the squad returned to secure the bunkers and guard the weapons from October 9 to the 19th.

On October 6, 1LT Melano, the company executive officer and acting commanding officer, took an M–79 grenade launcher and a MAC machine gun from the weapons cache as unit trophies. 1LT Melano testified that, at the time, he was "under the impression from my battalion commander that we could legitimately take some weapons back with us."

SGT Marjamaki, the squad leader, testified that 1LT Melano gave him permission to give his squad bayonets from the weapons cache. However, 1LT Melano testified that he did not give such authorization, but instead told SGT Marjamaki that he would "check with higher" and "get permission." Nonetheless,

each member of the squad then received a bayonet from Marjamaki. Additionally, during a routine patrol on October 10, SGT Marjamaki and appellant removed three Desert Eagle pistols from Bunker 4.

On October 14, PVT (formerly SPC) Mangold, the unit supply noncommissioned officer and 1LT Melano's driver, delivered water to SGT Marjamaki's squad. According to both SGT Marjamaki and PVT Mangold, the two soldiers discussed getting PVT Mangold a Desert Eagle pistol from the weapons cache. PVT Mangold testified that "I told him I was going to try to get it back to the States." SGT Marjamaki also mentioned that he and appellant had removed three Desert Eagle pistols from the cache and that the pistols "could get back with the unit armorer."

According to SGT Marjamaki, the entire squad stood nearby and overheard his conversation with PVT Mangold. PVT Mangold testified that the nearest person was appellant, who he thought was "just listening to us." PFC Holland also testified that appellant stood nearby. However, appellant testified that he neither saw SGT Marjamaki and PVT Mangold nor heard the conversation between the two of them.

Four soldiers testified that SGT Marjamaki then gave the bunker keys to appellant. Appellant testified that SGT Marjamaki told him to get PVT Mangold a Desert Eagle pistol. PFC Holland testified that SGT Marjamaki said "if he gets caught, tell them I don't know nothing about it." Another soldier at the scene, PVT· Victor, did not recall SGT Marjamaki making this statement. Appellant then removed a Desert Eagle pistol from Bunker 4 and gave it to PVT Mangold.

SGT Marjamaki testified that sometime between October 16 and 19, SFC Jones, the platoon leader, told the squad that all weapons had to be returned to the bunker. SGT Marjamaki testified that he sent appellant to Bunker 4 to return the bayonets, the Desert Eagle pistols, and the M–79 and MAC ma-

---

* Paragraph 5e(1)(c) states: "No weapon, munition, or military article of equipment captured or acquired by any means other than official issue

may be retained for personal use or shipped out of the JOA for personal retention or control."

chine gun removed by 1LT Melano. The Desert Eagle pistol given to PVT Mangold was not among the weapons returned.

1LT Melano testified that he did not learn of the specific General Order # 1 prohibition against war trophies until after October 19. Members of the squad testified that they were not briefed on General Order # 1 until October 28.

## II. ANALYSIS

In reviewing for legal sufficiency, this Court applies the following test: "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 MJ 324 (CMA 1987)(citing *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781). When applying this test, this Court is "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Blocker*, 32 MJ 281, 284 (CMA 1991).

The offense of larceny requires that the following elements be proven:

(1) That the accused wrongfully took, obtained, or withheld certain property from the possession of the owner or of any other person;

(2) That the property belonged to a certain person;

(3) That the property was of a certain value, or of some value; and

(4) That the taking, obtaining, or withholding by the accused was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any person other than the owner.

Para. 46b(1), Part IV, Manual for Courts–Martial, United States (2000 ed.).

The second and third elements were not in dispute. Testimony at trial showed that the weapon belonged to the Haitian government (element 2) and that it had value (element 3). The issue for the panel, then, was whether appellant knew that the taking was wrongful (element 1) and possessed the specific intent to permanently deprive (element 4) when he removed the pistol from the weapons cache.

First, the panel could reasonably infer that appellant overheard the conversation between SGT Marjamaki and PVT Mangold, during which Mangold informed SGT Marjamaki of his intent to take the pistol home, and listened to SGT Marjamaki tell him about the three Desert Eagle pistols that he and appellant had removed from Bunker 4. These statements indicated that PVT Mangold was not asking for the pistol as a unit trophy, but for his own use. Three witnesses (Marjamaki, Mangold, and Holland) placed appellant close enough to have overheard this conversation. While appellant disputes having overheard (or even seen) the conversation, it was for the panel to assess the credibility of the witnesses' competing statements. The panel, believing that appellant overheard the conversation, could have concluded beyond a reasonable doubt that appellant knew removing the pistol from the weapons cache was wrongful.

Second, even if appellant did not overhear the conversation between SGT Marjamaki and PVT Mangold, PFC Holland testified:

> PFC Holland: Well, as Pacheco was leaving to go to the bunker, he said "if he gets caught, tell them I don't know nothing about it."

On cross, defense counsel, recharacterizing PFC Holland's statement, asked:

> DC: And then after Specialist Pacheco walked away was when he made the comment that if Mangold was caught, he, Sergeant Marjamaki, didn't know anything about it.

To this PFC Holland responded, "Yes, sir."

The record is ambiguous as to whether SGT Marjamaki actually made this statement, where appellant was when SGT Marjamaki made this statement, and whether appellant heard SGT Marjamaki's statement. In *United States v. McGinty*, 38 MJ 131 (CMA 1993), this Court states: "In resolving legal sufficiency questions, this Court is bound to draw every reasonable inference from the evidence of record in favor of the

prosecution." *Id.* at 132 (quoting *Blocker,* 32 MJ at 284). I conclude, based on the record, that a panel could reasonably infer that SGT Marjamaki made the statement and that appellant overheard it.

Lawful orders do not need to be disavowed. The panel, believing that appellant overheard SGT Marjamaki's statement, could also have concluded beyond a reasonable doubt that appellant knew he was not acting pursuant to a lawful order. Thus, a reasonable factfinder could have found that appellant either overheard SGT Marjamaki disavow his actions or overheard the conversation between SGT Marjamaki and PVT Mangold, or both. Either finding would negate the defense that appellant merely followed apparently lawful orders.

The offense of dereliction in the performance of one's duties requires that the following elements be proven:

(1) That the accused had certain duties;

(2) That the accused knew or reasonably should have known of the duties; and

(3) That the accused was willfully derelict in the performance of those duties.

Para. 16b(3), Part IV, Manual, *supra.*

The first two elements were not in dispute at trial. Appellant had a duty to safeguard the bunkers and the weapons within (element 1). In addition, appellant knew of this duty (element 2). Thus, the issue facing the panel was whether appellant was willfully derelict in the performance of those duties (element 3).

The panel could reasonably find that appellant was willfully derelict based on the conclusion above. If the panel believed beyond a reasonable doubt that appellant was not merely following valid orders—but knew that removing the pistol was wrong—then the specific intent to steal also shows willfulness in the dereliction of one's duty.

I would affirm the panel's finding regarding dereliction on this basis alone, without addressing appellant's failure to later return the pistol or to report its removal, in a context where his squad leader and superior failed to do the same. (I accept, as a matter of law, that larceny and dereliction of duty can also be established through withholding of property; however, this is a case about a wrongful taking.)

Based on the foregoing, I am satisfied that there is sufficient evidence on the record from which rational factfinders could conclude beyond a reasonable doubt that the essential elements of larceny and dereliction in the performance of duties were proven.

SULLIVAN, Judge (dissenting):

Two questions are raised in this case. First, was the evidence legally sufficient to support appellant's conviction for stealing a "Desert Eagle pistol," which was "property of the Government of Haiti?" Second, was the evidence legally sufficient to support his conviction for dereliction of his duty to ensure "the security of military weapons of the Government of Haiti, in custody of U.S. forces?"

The evidence in this case showed that appellant retrieved a Desert Eagle pistol from a secured weapons bunker and gave it to another soldier, PVT Mangold. *However, overwhelming evidence also demonstrated that appellant was acting on an order from his squad leader, SGT Marjamaki, when he did so.* Moreover, no evidence was presented that a reasonable factfinder could find appellant knew or should have known that this order was unlawful. In my view, the evidence was not legally sufficient to disprove appellant's defense of obedience to the apparently lawful orders of SGT Marjamaki.

It is a bedrock principle of military law that obedience to an apparently lawful order is a defense to any offense punishable by court-martial. *See* RCM 916(d), Manual for Courts–Martial, United States (1994 ed.).[1] In cases of larceny, this military defense negates the first and most critical element of

---

1. All citations to Manual provisions are to the version in effect at the time of appellant's court-

martial. The current version is unchanged.

the offense, *i.e., that the taking was wrong-ful.*[2]

> The taking, obtaining, or withholding of the property must be wrongful. As a general rule, a taking or withholding of property from the possession of another is wrongful if done without the consent of the other, and an obtaining of property from the possession of another is wrongful if the obtaining is by false pretense. *However, such an act is not wrongful if it is authorized by law or apparently lawful superior orders*....

Para. 46c(1)(d), Part IV, Manual for Courts–Martial, United States (1994 ed.) (emphasis added).

An order given to a servicemember to perform a military duty "is presumed lawful"; "a subordinate disobeys an order at his peril." *United States v. Cherry*, 22 MJ 284, 285 (CMA 1986) (citing para. 14c(2)(a)(i), Part IV, Manual for Courts–Martial, United States, 1984); *see also United States v. New*, 55 MJ 95, 117–18 (2001) (Sullivan, J., concurring in the result). As this Court, quoting Winthrop, stated in its disposition of the case of First Lieutenant William Calley, Jr., in 1973:

> [F]or the inferior to assume to determine the question of the lawfulness of an order given him by a superior would of itself, as a general rule, amount to insubordination, and such an assumption carried into practice would subvert military discipline. *Where the order is apparently regular and lawful on its face, he is not to go behind it to satisfy himself that his superior has proceeded with authority, but is to obey it according to its terms, the only exceptions recognized to the rule of obedience being cases of orders so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness*....

> Except in such instances of *palpable illegality*, which must be of rare occurrence, the inferior *should presume that the order was lawful and authorized and obey it accordingly,* and in obeying it can scarcely fail to be held justified by a military court.'

*United States v. Calley*, 22 USCMA 534, 543, 48 CMR 19, 28 (1973) (quoting William Winthrop, *Military Law and Precedents* 296–97 (2d ed. 1920 Reprint)) (emphasis added). Thus, a subordinate must obey all orders except those that are "palpably" illegal. The question of whether a particular order was "palpably" illegal—and, in turn, whether compliance with such an order would not constitute a valid defense to a court-martial charge—is reviewed from the perspective of a "man of ordinary sense and understanding." *Id.* at 542, 48 CMR at 27.

A. *Evidence demonstrated that appellant was complying with an apparently lawful order from his squad leader, SGT Marjamaki.*

At appellant's court-martial, evidence was presented that on October 14, 1994, PVT Mangold arrived at the bunker complex where appellant was staying to deliver water to the squad. (R. 388) PVT Mangold started talking to SGT Marjamaki and asked whether he could obtain a .357 Desert Eagle pistol. (*Id.*) SGT Marjamaki told him he could, and walked back to where appellant was sitting with some of the other squad members. (R. 409) SGT Marjamaki then tossed appellant the keys to the weapons bunker and told him to get a Desert Eagle pistol for SGT Mangold out of the bunker. (*Id.*)

The record contains testimony from three witnesses who saw and heard SGT Marjamaki approach appellant, throw him the keys to the weapons bunker, and say, "Go get him one," or "Go get one." (R. 409) (testimony of

2. The elements of larceny are as follows:
   (a) That the accused *wrongfully took*, obtained, or withheld certain property from the possession of the owner or of any other person;
   (b) That the property belonged to a certain person;
   (c) That the property was of a certain value, or of some value; and

   (d) That the taking, obtaining, or withholding by the accused was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any person other than the owner.
Para. 46(b)(1), Part IV, Manual for Courts–Martial, United States (1994 ed.) (emphasis added).

8

PFC Holland); (R. 427–28, 437–38) (testimony of PFC Victor). Appellant himself recounted the conversation as follows: "He told me to go—go get him one, um, and I'm quite sure he told me to make sure everything was there with it, sir." (R. 479) Even trial counsel, when giving his closing argument, attributed this remark—"Go get him one"—to SGT Marjamaki in describing the sequence of events surrounding the taking of the weapon. (R. 612)

The evidence also showed that appellant clearly perceived this instruction as an order, and one which he was not at liberty to ignore. During appellant's cross-examination by the Government, the following exchange occurred:

Q: Did you believe you were receiving an order from Sergeant Marjamaki or was he just asking you to do something?

A: He didn't ask me in a question form. *He told me to do so,* and from I'd say basic training through—even more at my unit, *I've always been told when a noncommissioned officer tells me to do something, to do it, not question it, and if I do question it, question it after it's done, sir.*

Q: Did you question it after it was done?

A: I do now and I did when CID started investigating what was going on, sir. At the time, no I didn't, sir.

(R. 498) (emphasis added).

No evidence was presented rebutting the evidence showing that SGT Marjamaki ordered appellant to get the weapon for PVT Mangold. SGT Marjamaki, testifying under a grant of immunity, explained the incident as follows: "So I tossed the keys to Specialist Pacheco and Pacheco went to the bunkers and got him one." (R. 343) It should be noted that this testimony, while avoiding reference to a spoken order, does not contradict the testimony of the other three witnesses who testified that SGT Marjamaki said, "Go get him one." Furthermore, SGT Marjamaki later admitted at least constructive responsibility for transferring the weapon to PVT Mangold. He testified:

Q: On the 14th, again, was the day that *you gave the weapon to [Private] Mangold?*

A: *Yes, sir.*

(R. 369) (emphasis added).

Thus, the record contains overwhelming evidence that appellant was directed by his military superior, SGT Marjamaki, to get a Desert Eagle pistol for PVT Mangold.

B. *No evidence was presented that appellant knew or should have known that the order was unlawful.*

The next question we must consider is whether there was any evidence showing that a person of ordinary sense and understanding would have thought the order given by SGT Marjamaki was "palpably illegal." *See* RCM 916(d); *United States v. Calley, supra.* In this regard, the Government introduced into evidence General Order # 1, issued by the Joint Task Force Commander of Operation Uphold Democracy on September 10, 1994. That order prohibited, *inter alia,* the taking of Haitian weapons as war trophies or for any other purpose.

Significantly, however, the company's executive officer, 1LT Melano, testified that he did not learn of General Order # 1 until *after* his unit was relieved of duty to guard the weapons bunker on October 19, 1994. (R. 559) Moreover, the evidence also revealed that General Order # 1 was not read to all soldiers until October 28 or 29, 1994. (R. 383–85) *The incident at issue here took place on October 14, 1994—two weeks earlier.* (R. 342–43) No evidence was presented that the soldiers in 1LT Melano's unit—including appellant, SGT Marjamaki, and PVT Mangold—were aware of this command order on October 14, 1994.

Furthermore, no evidence was introduced tending to show that appellant or members of appellant's unit knew or should have known that weapons were not to be taken as war trophies. SGT Marjamaki never briefed his soldiers on whether they were or were not allowed to take war trophies. (R. 361) However, SGT Marjamaki did give everyone in the squad a bayonet from the weapons bunker. (R. 348–49, 417, 431) He testified (under immunity) that "[i]t didn't seem like a big deal. I mean everybody was taking [weapons] and we just would have kept them

there until we got a call from higher up that said we couldn't have them." (R. 592) The sergeant also pointed a finger at 1LT Melano: "[W]e got told by the lieutenant that— Lieutenant Melano that everything was good to go until we got told by higher[.]" (R. 593)

On October 14, when PVT Mangold visited the unit and requested the Desert Eagle from SGT Marjamaki, SGT Marjamaki assumed that PVT Mangold (who was 1LT Melano's driver) was taking it back to the command post as a unit trophy. (R. 360) The evidence further demonstrates that SGT Marjamaki believed it was acceptable to take weapons not only as unit trophies, but for personal reasons as well. When asked whether he thought there was anything "wrong with taking firearms for your personal, take-it-home-do-whatever-you-want-to, use," SGT Marjamaki responded, "At that time it seemed all right, sir." (R. 594)

This evidence is consistent with 1LT Melano's testimony concerning his understanding of the war trophy "policy." 1LT Melano testified that he took two Haitian weapons down to the company command post—an M–79 grenade launcher and a MACS machine gun—at the behest of his commander, Colonel (COL) Sullivan. He explained, "I was under the impression from my battalion commander we could legitimately take some weapons back with us." (R. 554, 57–58) Interestingly, COL Sullivan also ordered 1LT Melano to seize an antique flint lock rifle as a unit trophy. (R. 555) No one questioned these acts until 1LT Melano was told that the chain of command had decided not to approve the taking of war trophies, whereupon 1LT Melano returned the M–79 and MACS to the bunker. When SGT Marjamaki learned that the trophies were not permitted, he collected the bayonets he had previously distributed to his squad and had appellant return them to the bunker. (R. 349) This occurred *after* the incident in question, on about the 17th of October. (R. 279, 404, 415)

Finally, appellant's own understanding of the situation demonstrates that SGT Marjamaki's order to give a Desert Eagle pistol to PVT Mangold would have appeared lawful to a person of ordinary sense and understanding. *See* RCM 916(d); *United States v. Calley, supra.* Appellant knew that PVT Mangold was 1LT Melano's driver and the supply NCO, and when PVT Mangold came to get the Desert Eagle, appellant "presumed or kind of put together that Mangold being the XO's driver that the weapon was for the—for the CP [command post], and it was being brought there for the same reason the other weapons had been." (R. 482) Appellant did *not* believe the weapon was going to Mangold for his own personal use. (R. 491) Considering that other weapons had already been taken to the command post by appellant's superiors to keep as unit trophies, this was a reasonable belief.

The majority attempts to sidestep this unrefuted evidence that appellant followed an apparently lawful order by pointing to a remark allegedly made by SGT Marjamaki after ordering appellant to the bunker. According to PFC Holland, SGT Marjamaki stated that he would disavow knowledge of giving the weapon to PVT Mangold in the event that Mangold was "caught." The majority contends that the evidence supports the conclusion that appellant heard this disavowal of knowledge and, thus, should have realized that what he had been asked to do was not legal. PFC Holland testified to this remark as follows:

Q: Did you actually see Specialist Pacheco give [Private] Mangold the weapon?

A: No, I didn't.

Q: So, all you really saw is Sergeant Marjamaki give Specialist Pacheco the keys?

A: Yes, I did.

Q: And he told him to go get him one?

A: Yes, sir.

Q: Did you hear Sergeant Marjamaki say anything else?

A: *Well, as Pacheco was leaving to go to the bunker, he said if he gets caught, tell them I don't know nothing about it.*

(R. 410) (emphasis added).

Following this line of questioning, defense counsel had PFC Holland clarify this incident for the members:

Q: Did Sergeant Marjamaki hand the keys to Specialist Pacheco or just kind of toss them to him? How did that work?

A: It was kind of like a short toss; close to handing them. He just threw them.

Q: So, he just walked over to where you guys were and tossed him the keys?

A: Right. He was standing like with—within two to three feet from where I was at.

Q: *And then after Specialist Pacheco walked away was when he made the comment that if Mangold was caught, he, Sergeant Marjamaki, didn't know anything about it?*

A: *Yes, sir.*

DC: No further questions, Your Honor.

(R. 418–19) (emphasis added).

Curiously, the majority deals with this evidence by ignoring it, as follows:

Although the evidence shows that SGT Marjamaki told appellant to obtain the Desert Eagle for PVT Mangold, we need not consider whether such a directive constituted an apparently lawful order. The testimony of Private First Class (PFC) Holland—*which was not challenged by the defense*—that *SGT Marjamaki disavowed in appellant's presence* any knowledge of or responsibility for appellant's taking of the weapon effectively nullifies appellant's argument that he acted pursuant to an apparently lawful order in taking the Desert Eagle.

56 MJ at 2 (emphasis added).

The record, however, clearly indicates that the defense did challenge this interpretation of events by requiring PFC Holland to explain that SGT Marjamaki's remark was made after appellant had walked away. The record contains no evidence contradicting this testimony. Indeed, the other eyewitness to this scene, PFC Victor, did not hear SGT Marjamaki making any such remark disavowing knowledge of the incident. He testified:

Q: Okay. PFC Victor, I'm going to ask you again: please tell the members of the panel what you heard Sergeant Marja-maki say when he handed over the keys? Nice and loud, please.

A: He said to go get him one, and that was ——

Q: *Okay, did you hear him say something else?*

A: *No, sir.*

Q: Well, you indicated that he said something else after he transferred the keys?

A: He turned towards us and he said that [Private] Mangold said he could get one out. Just basically just turned around and kind of shrugged, sir, saying that he could get one out, and then walked back towards the tower, sir.

Q: Okay. *Did you hear Sergeant Marjamaki say something about what you should do if Specialist Mangold had gotten caught?*

A: *No, he did not, sir.*

Q: *You didn't hear anything to the effect that if he gets caught, we don't know anything about it?*

A: I heard that—*I never heard that from him,* but I heard *them* saying something like if he got one, that Specialist Mangold did not get it from him.

MJ: Okay. Take the chair and put it right there.

WIT: Yes, sir.

[The witness moved the chair in the middle of the room.]

MJ: And face the jury.

[The witness did as directed.]

MJ: Alright. Ask him the last question again.

Q: PFC Victor, at the time you saw Sergeant Marjamaki hand the accused the keys, *did you hear him say anything to the effect of what you should do if Specialist Mangold had gotten caught with the weapon?*

A: *No, I did not, sir.*

Q: Okay, please continue with the rest of your answer.

A: From?

Q: Your answer continued when I asked the question the first time. Please continue.

A: He just basically—after he gave the keys to ——

MJ: Speak up!

A: After he gave the keys to Specialist Pacheco, he just turned to us and basically said that he could get one out, and then walked off towards the back—towards the tower, sir.

Q: Okay, did he say anything to the effect if anybody asks you, he didn't get it from me?

A: *He never told me that, sir,* but I mean I heard him say *like from others* that if Mangold got one, that he would—that he did not get it from him, sir.

(R. 427-29) (emphasis added).

Despite persistent questioning by the Government, PFC Victor consistently held to his testimony that he did not hear SGT Marjamaki make this remark, and that he had learned of it only through the reports of others. In sum, there was no evidence presented whatsoever that appellant heard or could have heard this alleged disavowal by SGT Marjamaki.

Without sufficient evidence to support a wrongful taking theory of larceny, the only other basis on which to affirm appellant's conviction is a wrongful withholding theory. However, this Court cannot affirm a conviction based on a theory of criminal liability never presented to the trier of fact. *See United States v. Standifer,* 40 MJ 440, 445 (CMA 1994); *United States v. Riley,* 50 MJ 410, 415 (1999); *Dunn v. United States,* 442 U.S. 100, 106, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979); and *Rewis v. United States,* 401 U.S. 808, 814, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

The ultimate issue for this Court on the larceny conviction is whether there is any evidence in the case from which a reasonable member could conclude that appellant's taking of the Desert Eagle was wrongful. I have no choice but to conclude that there is not. The testimony of the witnesses, especially appellant's superiors, demonstrates such an atmosphere of ignorance of command policy that no reasonable jury could find that appellant's obedience to orders was palpably illegal. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

With regard to the dereliction of duty charge, evidence was presented that appellant knew or reasonably should have known of his duty to safeguard the weapons from unlawful appropriation. After learning that his superiors had prohibited the taking of war trophies, appellant was put on notice that future takings would be unlawful.

The majority argues that appellant's guilt on the dereliction charge is established by his failure "to return the weapon or to inform the authorities of its taking." 56 MJ at 3. Again, however, this theory is not available to this Court as a basis for sustaining appellant's conviction for dereliction because it was never presented to the members at trial. *See United States v. Standifer, supra.*

Accordingly, I would reverse the decision of the United States Army Court of Criminal Appeals.